**In re Eugene F. JONES and Peggy Lou Jones, Debtors.**

**The CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CAROLINA, Plaintiff,**

v.

**Eugene F. JONES and Peggy Lou Jones, Defendants.**

**Bankruptcy No. 80–00157.**
**Complaint No. 80–0067.**

United States Bankruptcy Court, D. South Carolina.

May 5, 1981.

200

Robinson, McFadden, Moore, Pope & Stubbs by John T. Moore, Columbia, S.C., for plaintiff.

Kay F. Paschal, Cayce, S.C., for defendants.

## ORDER

J. BRATTON DAVIS, Bankruptcy Judge.

The plaintiff, Citizens and Southern National Bank of South Carolina (hereinafter "C&S"), commenced this adversary proceeding against the defendant-debtors, Eugene Jones and Peggy Jones, in order to except a debt from discharge under 11 U.S.C. § 523(a)(2)(A). The debt in issue is evidenced by a note executed on April 11, 1979 which the defendants personally guaranteed.

C&S asserts that the defendants are personally liable for obtaining credit from C&S by actual fraud. The defendants deny that they obtained credit from C&S through actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A). In addition, the defendants assert two affirmative defenses. First, the defendants assert that they entered into a novation with C&S. The defendants claim that this novation extinguished any tort claim for fraud that C&S had against the defendants and created a dischargeable contract debt evidenced by the defendants' personal guarantees of the April 11, 1979 note.

Second, defendants assert that C&S acting through counsel entered into an enforceable agreement with Eugene Jones and the defendants' attorneys not to oppose the defendants' bankruptcy and that this agreement is a bar to the current action.

## DISCUSSION

The court's discussion will be divided into three sections. First, the court will set forth its determination of whether the defendants obtained money from C&S by actual fraud. Second, the court will set forth its findings relating to whether the defendants and C&S entered into a novation. Finally, the court will set forth its findings relating to whether an enforceable agreement was made that barred C&S from commencing this action.

### I

### *Creation of debt for obtaining money by actual fraud*

At the conclusion of the hearing held in this proceeding on September 26, 1980, the court found that the debt represented by the April 11, 1979 note was created by fraud. Herein, the court will set forth the specific facts upon which it relied in making this finding. Furthermore, the court will set forth facts that support its conclusion that the defendants became personally liable to C&S for this debt.

Draft Acceptance was a business entity created for Eugene Jones and Capital City Auto Auction of Lexington, Inc. Draft Acceptance maintained a checking account at the Lexington branch of C&S. As of April 11, 1979 Draft Acceptance had overdrawn its account by $350,000.

Capital City Auto Auction of Lexington, Inc. (hereinafter "Capital Auction") was in the business of selling used automobiles. Eugene Jones was president of Capital Auction and a major shareholder in the corporation. As such, he controlled the business operations of Capital Auction. His wife, Peggy Jones, was employed by Capital Auction. She prepared drafts and certificates of title for sales of vehicles by Capital Auction.

Commencing in May of 1978 Capital Auction implemented a scheme whereby it purported to sell nonexistent automobiles. The buyers in the sham sales transactions were Hornsby's Used Cars and Capital City Chevron. Hornsby's Used Cars was a fictitious entity and Capital City Chevron was controlled by Eugene Jones and Capital Auction. To effect these sham sales, Peggy Jones and other employees of Capital Auction used certificates of title for the nonexistent automobiles. Peggy Jones and other employees also prepared sight drafts drawn on the purported buyers, Hornsby's Used Cars and Capital City Chevron, in the amount of the purchase price. The certificates of title were attached to the sight drafts.

Capital Auction then endorsed the sight drafts with certificates of title attached over to Draft Acceptance. Richard Bonnette, acting for Draft Acceptance, then deposited the sight drafts in Draft Acceptance's account with C&S. Prior to late March 1979 C&S granted Draft Acceptance immediate credit for the sight drafts. Once these deposits had been made, Draft Acceptance would draw cashier's checks upon its accounts payable to Capital Auction. Capital Auction would then funnel the funds to its agents to enable Hornsby's Used Cars and Capital City Chevron to honor the sight drafts when presented.

This scheme collapsed in late March of 1979 when C&S refused to grant Draft Acceptance immediate credit for the sight drafts which it had deposited. The result was that Draft Acceptance's account with C&S was overdrawn by approximately $350,000.

The court has no difficulty in concluding that C&S was the victim of a fraudulent scheme. Furthermore, in his capacity as president of Capital Auction, Eugene Jones was one of the principal parties in implementing the scheme. Although Eugene Jones testified that he executed the scheme under the belief that it was legal and in effect a loan, the court finds this testimony incredible. Moreover, as a result of his

participation in the scheme, Eugene Jones was indicted under 18 U.S.C. § 1014 for knowingly and willingly overvaluing securities to obtain credit from C&S. Pursuant to a plea agreement, on May 2, 1980, Eugene Jones plead guilty to one count of the indictment. Hence, this court finds that Eugene Jones participated in a scheme to obtain credit from C&S by actual fraud. On the basis of this finding, the court holds that Eugene Jones became indebted to C&S for obtaining credit by actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

Although Peggy Jones may have been less culpable than Eugene Jones, she did participate actively and knowingly in the fraudulent scheme to obtain credit from C&S. Peggy Jones admitted that she prepared certificates of title for automobiles which she knew did not exist. Peggy Jones also admitted that she knew that the sight drafts which she had prepared were fraudulent. Finally, Peggy Jones admitted that she knew C&S would extend credit against these fraudulent drafts. The court holds that these findings are sufficient to render Peggy Jones liable to C&S for obtaining credit by actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

## II

### Novation

The defendants assert that they entered into a novation agreement with C&S which had the effect of extinguishing the fraudulent debt and substituting a contractual debt which would not be excepted from discharge.

■ The defendants bear the burden of proof on establishing the defense of a novation. *Superior Automobile Insurance Co. v. Maners*, 261 S.C. 257, 199 S.E.2d 719 (1973); *Ophuls and Hill, Inc. v. Carolina Ice and Fuel Co.*, 160 S.C. 441, 158 S.E. 824 (1931). In order to meet their burden the defendants must establish that C&S agreed to release the fraud claims against them.

In an attempt to support their defense of novation, the defendants rely upon a note executed on April 11, 1979. The note was payable to C&S in the amount of "$350,000 or so much as may be outstanding on our books." The note was executed by Capital Auction and Draft Acceptance. Payment of the note was personally guaranteed by Eugene Jones, Peggy Jones, and Richard Bonnette. The note was secured by a mortgage upon real estate owned by Capital Auction and Eugene Jones.

■ Some courts have found that a novation has the effect of extinguishing a debt that could have been excepted from discharge. *See, e. g., Maryland Casualty Co. v. Cushing*, 171 F.2d 257 (7th Cir. 1948); *In re Kelley*, 259 F.Supp. 297 (N.D.Cal. 1965). Nevertheless, the mere execution of a note is insufficient to establish a novation. *Levin v. Singer*, 227 Md. 47, 175 A.2d 423 (1961); 6 *Corbin on Contracts* § 1298 (1962). The general rule is that a note is evidence of indebtedness and does not extinguish the debt for which it is given. *Maryland Casualty Co. v. Cushing*, 171 F.2d 257 (7th Cir. 1948). For the defendants to prevail on their novation argument, they must establish the existence of an agreement that the note was given and received as a discharge of the original tort claim. *See, General Insurance Company of America v. Klein*, 517 S.W.2d 726 (Mo.App.1974); *Maryland Casualty Co. v. Cushing*, 171 F.2d 257 (7th Cir. 1948). In order to establish such an agreement, the defendants must prove that it was the clear and definite intention of C&S at the time of the execution of the note, to accept the note in full satisfaction of the fraud claim. *See, Levin v. Singer*, 227 Md. 47, 175 A.2d 423 (1961). The record in this proceeding is devoid of such evidence. Defendants have presented no evidence that C&S agreed to abandon its fraud claim in exchange for the note. In short, defendants have failed to meet the burden of proving a novation. The execution of the note on April 11, 1979 did not extinguish the debt owed C&S for obtaining money by actual fraud.

## III

### "No Opposition" Agreement

■ The defendants contend that C&S, acting through its attorney, entered into a

binding agreement not to seek an exception to the defendants' discharge. Hence, defendants contend C&S is barred by contract from seeking the relief herein requested.

In November of 1979, C&S commenced foreclosure proceedings against the real property securing the April 11, 1979 note. The sale date was set for Monday, April 7, 1980. On April 2, 1980, the defendants petition for relief under Chapter 7 of the Bankruptcy Code. The effect of the defendants' petition was to stay the foreclosure proceeding pending in the state court.

C&S's attorney, wanting to obtain quick relief from the stay, scheduled a hearing on relief from the stay for April 4, 1980. On April 2, 1980, he called Mr. Bryan, the defendants' attorney in the state foreclosure proceeding, seeking consent to an order releasing the real estate under foreclosure from the effect of the stay. Mr. Bryan asked C&S's attorney if the defendants agreed to release the real estate from the stay "would he not oppose the bankruptcy." C&S's attorney responded that he would not oppose the bankruptcy; he did not say anything about the discharge of the debt. In his deposition taken on September 23, 1980, C&S's attorney was asked if he stated or agreed that C&S would not oppose the bankruptcy if the defendants consented to relief from the stay. He responded:

> "If I stated that the Bank would not oppose the bankruptcy, you might have understood that to say—to be that I was releasing Jones, but that would not have been what I meant, if I made such a statement. To not oppose the bankruptcy, is not clear in my mind; it's not clear in my mind what that means."

After talking with C&S's attorney, Mr. Bryan communicated with Miss Paschal, who represents the defendants in their bankruptcy case, and informed her of the statement that C&S would not oppose the defendants' bankruptcy.

On the evening of April 3, 1980, C&S's attorney prepared the consent order and on April 4, 1980, he took the consent order to Miss Paschal's law office to obtain her signature and that of Eugene Jones. During the April 4, 1980 meeting, Miss Paschal asked C&S's attorney whether or not C&S would give the defendants any problems with the bankruptcy. The response indicated that C&S would not cause the defendants any problems.

The essence of the defendants' argument appears to be that C&S agreed not to seek an exception from discharge in consideration for defendants' consent to release C&S from the stay. In analyzing this argument, much depends upon the meaning which the parties attributed to the phrase "not to oppose bankruptcy." C&S's attorney clearly did not equate this phrase with "not to seek an exception from discharge." That he did not attribute such a meaning to the phrase, however, does not preclude this court from finding an agreement to refrain from seeking an exception from discharge. Section 21A(2)(b) of the *Restatement (Second) Contracts* provides:

> "That manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if . . . that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party."

C&S's attorney's deposition indicates that he had reason to know that Mr. Bryan may have believed that "to not oppose bankruptcy" meant, not to seek an exception from discharge. The resolution of this issue, however, must turn on whether Mr. Bryan and Miss Paschal, on April 3–4, 1980, actually believed that "to not oppose bankruptcy" meant not to seek an exception from discharge. This court finds that on April 3 and 4, neither Mr. Bryan nor Miss Paschal attributed such a meaning to the phrase. Both attorneys knew that C&S had steadfastly refused to release Eugene and Peggy Jones from personal liability for a deficiency judgment in the mortgage foreclosure action and that an agreement not to seek an exception from discharge would be a complete reversal of C&S's position. Moreover, when C&S commenced this proceeding on May 9, 1981 neither Mr. Bryan nor Miss Paschal protested to C&S a breach of the

alleged agreement. Finally, the "no opposition argument" was not raised in the defendant's original answer; it was not added until July 23, 1981. The court is convinced that on April 3 and 4 the attorneys for the defendants did not believe that C&S had agreed not to seek an exception to the discharge of C&S's claim.

The court concludes that the "no opposition" agreement does not bar the present action.

## ORDER

It is ORDERED, ADJUDGED AND DECREED that the debt of the defendants to the plaintiff as evidenced by the note executed on April 11, 1979 and personally guaranteed by the defendants is nondischargeable in this case under Title 11 of the United States Code.